IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| JACQUELINE Y. MINIFIELD, )<br>as Administrator and Personal )<br>Representative of the Estate of )<br>D'LONDRE MINIFIELD and in )<br>her Individual Capacity, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>STEPHANIE SILLS, )<br>)<br>Defendant. ) | Civil Action No. 5:17cv43<br><br>By:    Michael F. Urbanski<br>Chief United States District Judge |

**MEMORANDUM OPINION**

At the center of this wrongful death and civil rights case is how D'Londre Minifield received the gunshot wound to his head that ended his life. The Autopsy Report authored by Frances P. Field, M.D., a pathologist employed by the Virginia Department of Health, Office of Chief Medical Examiner, listed the Cause of Death as "Gunshot Wound of Head" and the Manner of Death as "Suicide." Autopsy Report, ECF No. 242-1, at 2. Dr. Field's report states: "Autopsy revealed death from a contact gunshot wound to the right side of his head." Id. Defendant Stephanie Sills, the lone defendant remaining in this case, identified Jonathan L. Arden, M.D., a forensic pathologist, as an expert witness. Dr. Arden's opinion, consistent with that of the medical examiner, is that "Mr. Minifield died as a result of a self-inflicted, contact gunshot wound to the head, i.e., his death was a suicide." Arden Report, ECF No. 242-2, at 5.

Plaintiff has identified no experts with knowledge, training, or experience in medical science or forensic pathology. To controvert the conclusions of Drs. Field and Arden, plaintiff

1

offers Gerald Summers, a former police chief and crime scene investigator. At issue in the present motion is whether Summers is qualified to render an opinion on the nature of the gunshot wound to controvert Dr. Field's conclusion that Minifield's death resulted from a contact gunshot wound. Summers proposes to testify that Minifield "did not suffer a self-inflicted gunshot wound." Summers Report, ECF No. 242-4, at 7.

Defendant Sills filed a motion in limine, asserting that Summers lacks any qualifications to render what is essentially a medical opinion, that his opinions fail to meet the requirements of Federal Rule of Evidence 702, and his opinions are insufficiently reliable to be admitted in evidence under the standards enunciated by the Supreme Court in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), and Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999). Mot. in Limine, ECF No. 241. The matter has been fully briefed, and a Daubert hearing was held on June 30, 2022, during which Summers testified.

Based on the briefing and the evidence and argument presented at the June 30, 2022, Daubert hearing, the court will **GRANT** defendant Sills' motion in limine, concluding that Summers is not qualified to render an opinion as to the nature of D'Londre Minifield's gunshot wound and that his proposed opinion as to the nature of the injury suffered by Minifield fails to meet the reliability standards of Federal Rule of Evidence 702 and the Daubert line of cases.

I.

Rule 702 of the Federal Rules of Evidence provides that "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if (a) the expert's scientific, technical, or other specialized knowledge will

help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Rule 702 also requires that such opinion testimony be "based upon sufficient facts or data" that are "the product of reliable principles and methods" which have been reliably applied "to the facts of the case." Fed. R. Evid. 702(b)-(d).

If a witness is qualified as an expert to provide opinion testimony on a subject, a two-part test governs the admissibility of expert testimony. The evidence may be admitted if it "rests on a reliable foundation and is relevant." Daubert, 509 U.S. at 597. "Daubert demands . . . that the trial judge make a 'preliminary assessment' of whether the proffered testimony is both reliable (i.e. based on 'scientific knowledge') and helpful (i.e. of assistance to the trier of fact in understanding or determining a fact in issue)." Maryland Cas. Co. v. Therm-O-Disc, Inc., 137 F.3d 780, 783 (4th Cir. 1998)(citing Daubert, 509 U.S. at 592).

> As in all questions of admissibility, the proffering party must come forward with evidence from which the court can determine that the proffered testimony is properly admissible. However, there is no requirement in Daubert, or any other controlling authority, that the proffering party must 'prove' anything to the court before the testimony in question can be admitted.

Id.

As evidentiary gatekeeper, the district court performs an important role. "[E]xpert witnesses have the potential to be both powerful and quite misleading[;]" the court must "ensure that any and all scientific testimony ... is not only relevant, but reliable." Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001) (citing Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir.1999), and Daubert, 509 U.S. at 588, 595). "As with all other admissible evidence, expert testimony is subject to testing by 'vigorous cross-examination,

presentation of contrary evidence, and careful instruction on the burden of proof.'" United States v. Moreland, 437 F.3d 424, 431 (4th Cir.2006) (quoting Daubert, 509 U.S. at 596.

Daubert mentions specific factors to guide the overall relevance and reliability determinations that apply to all expert evidence. They include (1) whether the particular scientific theory "can be (and has been) tested;" (2) whether the theory "has been subjected to peer review and publication;" (3) the "known or potential rate of error"; (4) the "existence and maintenance of standards controlling the technique's operation;" and (5) whether the technique has achieved "general acceptance" in the relevant scientific or expert community. United States v. Crisp, 324 F.3d 261, 266 (4th Cir. 2003) (quoting Daubert, 509 U.S. at 593–94).

Despite these factors, "[t]he inquiry to be undertaken by the district court is 'a flexible one' focusing on the 'principles and methodology' employed by the expert, not on the conclusions reached." Westberry, 178 F.3d at 261 (quoting Daubert, 509 U.S. at 594–95); see also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999) ("We agree with the Solicitor General that '[t]he factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.'") (citation omitted); see also Crisp, 324 F.3d at 266 (noting "that testing of reliability should be flexible and that Daubert's five factors neither necessarily nor exclusively apply to every expert").

With respect to relevancy, Daubert also explains:

> Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful. The consideration has been aptly described by Judge Becker as one of fit. Fit is not always obvious, and scientific validity for one purpose is not necessarily

4

> scientific validity for other, unrelated purposes.... Rule 702's helpfulness standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.

Daubert, 509 U.S. at 591–92 (internal citations and quotation marks omitted).

## II.

In the March 3, 2020, ruling denying summary judgment, Mem. Op., ECF No. 218, the court stated "[w]hat is not clear at his point is whether… Summers possess[es] sufficient knowledge, skill, experience, training or education under Rule 702 to permit [him] to testify as to the nature of the gunshot wound sustained by D'Londre Minifield." Id. at 13. "At this point, … there is no basis to suggest that th[is] former police officer[ ] ha[s] sufficient expertise to provide what is essentially the opinion of a medically trained pathologist." Id. "In short, the court has not been presented with sufficient evidence that [the] retired police officer possesses sufficient expertise to render an opinion, based on D'Londre Minifield's head wound, as to the distance of the gun from his head when it was discharged." Id. at 14.

In the exercise of its gatekeeping function, the court conducted a Daubert hearing on June 30, 2022, at which Summers testified. As a result of the evidence adduced at the Daubert hearing on June 30, 2022, it is abundantly clear that Summers is not qualified to render a medical or pathological opinion to controvert the forensic pathologist, Dr. Fields', opinion that the "[a]utopsy revealed death from a contact wound to the right side of his head." Autopsy Report, ECF No. 242-1, at 2. In short, because he lacks any medical or pathology education, training, or experience, Summers is not qualified to render an expert opinion on how the bullet struck Minifield. This includes opinion testimony on the bullet's path, trajectory, and entry or exit. Summers is also not qualified to render an expert opinion on the nature and circumstances

5

of the gunshot wound, including whether it was a contact or close contact wound and the distance of the gun from Minifield's head when it was discharged.

### III.

Summers claims expertise in crime scene reconstruction and analysis based on the following. Summers graduated from the State of Idaho Peace Officers Standards and Training (POST) class #118 in June 1998, and received a number of certifications from POST between 1999 and 2006. Summers Report, ECF No. 242-4, at 4–5. Summers worked in law enforcement in McCall, Idaho from 1998 to 2012, holding positions of patrolman, school resource officer, detective sergeant, and police chief. Summers' report describes his 2005–2012 tenure as McCall Chief of Police as follows:

> As Chief of Police, I performed a variety of complex administrative duties and serve as the executive officer for the McCall Police Department. Developed and implemented plans, programs, policies, and operations of the Police Department. Directed recruitment and selection, supervision, evaluation and assignments of department personnel. Conducted sensitive investigations into allegations of official misconduct or violations of law by police officers, employees, and public officials. Conducted crime scene reconstruction and internal affairs investigations, including excessive use of force complaints. Performed duties of City Manager in his absence, overseeing a staff of over 80 full-time employees and ten department heads with an annual budget exceeding $ 17M.

Id. at 5.

Summers is presently the Executive Director of the Caldwell, Idaho Chamber of Commerce. Summers's January 15, 2019, report states:

> Currently, I am the Chief Executive Officer of Conflict Resolutions, LLC, located in Caldwell, Idaho. I have served in this capacity since December 2005. Conflict Resolutions, LLC, is a consulting firm that has provided analysis, planning and training

6

> for private organizations, governmental agencies and law enforcement agencies in the pacific northwest. We work independently, as well as in conjunction with The Results Group LTD. I am a certified Idaho POST Instructor and have taught various courses. I've authored and received certification for Idaho POST Class #146, a 40-hour Executive Level class entitled Managing Conflicts to Successful Resolutions. I am the author of Tarnishing of the Badge, a nonfiction work on why the law enforcement industry is on the cusp of crisis regarding public trusts, branding, and its ability to self-police. I have taught, consulted with, and served as guest lecturer for numerous professional organizations and universities, including Oregon DPSST Academy (Oregon POST) as well as Idaho State University.

Id.

Summers holds a Bachelor of Arts in Pastoral Ministry from Trinity College of the Bible & Theological Seminary, Indiana and a Master of Business Administration from the University of Liverpool. Id.

Summers's testimony at the Daubert hearing about his crime scene investigation experience was largely anecdotal and did not suggest that he possessed sufficient qualifications to render any opinion as to what the examination of Minified's gunshot wound indicates about how he was shot. Summers provided testimony about a few cases he worked on while at the McCall police department which involved blood spatter, e.g., the Manzone and Horton cases, but nothing about that testimony suggested that Summers is qualified to opine, from the autopsy photographs and report in this case, how the bullet entered Minifield's head, or how far away the gun was located when it was discharged.

Summers has no training, experience, or education which would permit him to testify as to what the autopsy report and photographs indicate happened to Minifield. Summers is not a medical doctor or pathologist and has no education, training, or experience to provide

7

what is essentially a medical or pathological opinion of how the bullet caused the damage to Minifield's head. As such, he will not be permitted to render an opinion from the autopsy report and photographs as to how the bullet struck Minifield, including its path, trajectory, entry or exit, and the nature and characteristics of the gunshot wound, including whether it was a contact or close contact wound and the distance of the gun from Minifield's head when it was discharged.

This conclusion is consistent with rulings of other courts facing similar issues. For example, in Ochoa v. Davis, No. CV 99-11129 DSF, 2016 WL 3577593, at *47 (C.D. Cal. June 30, 2016), the court addressed whether a former police officer could provide expert testimony on forensic issues in a state criminal trial. The court stated:

> Zbinden was not qualified to testify as to the forensic evidence relating to the murder. Zbinden testified that he was a licensed private investigator and that he previously had been a Pomona police officer for seventeen years. He further indicated that he worked for eight years in homicide and narcotics investigations and had received training at the FBI homicide institute as well as various other courses. Nothing in Zbinden's testimony indicated that he had the requisite training in forensic science to render an opinion as to the angle of stab wounds, the drag pattersns, the blood smear evidence, or anything else on which an opinion as to the number of perpetrators could be based.

Id. at *148–149; See also People v. Davenport, 906 P.2d 1068, 1089 (1995) (specifying that a police officer was not qualified to render an opinion on causes and time of death because he did not have any medical, serology, or pathology training). Likewise, in Buccheri v. Nogan, No. CV 17-13373 (JMV), 2019 WL 3712188, at *9 (D.N.J. Aug. 6, 2019), the court found a forensic pathologist could provide expert testimony about the manner of injury from review of an autopsy report. See also Weissert v. Palmer, No. 1:10-CV-851, 2015 WL 5680149, at *22

(W.D. Mich. Sept. 25, 2015) (discussing how a doctor was qualified as an expert in forensic pathology and the doctor's findings).

To be sure, Summers is critical of the crime scene investigation done of the Minifield shooting and has the experience to provide opinion testimony as to whether the handling of the Minifield crime scene was consistent with proper police procedures. But his education, training, and experience dictate that his expertise stops there.

**IV.**

Sills further challenges the reliability of Summers's proposed opinion under Rule 702 and the Daubert/Kuhmo Tire framework. At the Daubert hearing on June 30, 2022, Summers expressed the opinion that Minifield did not die from a self-inflicted contact gunshot wound. To a substantial extent, Summers grounds this opinion on his review of the autopsy report and photographs. However, because Summers lacks foundational education and experience in forensic pathology, his conclusions cannot be tested against forensic pathology methods and there is no acceptable basis upon which to scientifically test his opinion.

Nor are Summers' credentials, proposed theory, and methods supported by peer reviewed articles or publications. Summers admitted at the Daubert hearing that he has not authored any articles or publications related to head wounds or forensic pathology. He informed the court that his work was reviewed on two occasions by peers who were notable individuals in the police and crime scene investigation field. These individuals verbally told Summers he did a nice job handling an investigation and signed a book for him. While in a literal context this suggests that Summers's work received a peer's review, it does not meet the factor's actual meaning requiring written publication and review by a cohort of one's peers or

9

scholars in the field. Again, Summers is not qualified to testify as an expert on the nature and characteristics of Minifield's head wound.

Also at the Daubert hearing, Summers was unable to testify and give a definitive and supported known or potential rate of error for his theory of the case or crime scene investigation techniques. Summers did provide counsel with a percentage rate of error but this number was drawn from memory and not traceable to any publication or otherwise verifiable. Since Summers was unable to provide any assurance that his methods were accurate, verifiable, or recognized by the broader expert community, the court finds that this factor also favors granting Sills' motion in limine.

While Summers has experience in conducting crime scene investigations, that experience is a far cry from the field of forensic pathology for which one needs medical training. At the Daubert hearing, Summers identified textbook chapters and articles on aspects of crime scene investigation that he believes are consistent with his views. But simply providing articles is insufficient to meet the Rule 702 and Daubert reliability standards. Because he is not trained in medical science or pathology, Summers has no more ability to provide expert testimony as to the impact of the bullet on Minifield's scalp, skin, and skull than he has to provide a cancer diagnosis. Just as it would be inappropriate to allow a lay witness to render an opinion as to skin cancer based on photos of a lesion and a smattering of articles about cancer signs and symptoms, it is impermissible to allow a person lacking any medical or pathology training to provide an expert opinion as to what an autopsy report and autopsy photos show as to the nature and characteristics of a human bullet wound simply by referencing a few articles. To be sure, police officers see a lot of horrific things at crime scenes,

10

and Summers has experience in this realm. However, there is no suggestion that experience as a police officer in conducting crime scene investigation is generally accepted as being sufficient to render what are essentially medical opinions as to the cause of death and the impact of a bullet on human body tissue. That is, of course, why medically trained pathologists perform autopsies.

While the Daubert factors are not controlling and their evaluation is meant to be flexible, they support the conclusion that Summers not be permitted to testify as an expert on the nature of the D'Londre Minifield's wound or his cause of death.

**V.**

For the foregoing reasons, Stephanie Sills' Motion in Limine, ECF No. 241, is **GRANTED**. Plaintiff's proposed expert witness, Gerald Summers, may not offer opinion testimony as to how the bullet struck D'Londre Minifield, This includes opinion testimony on the bullet's path, trajectory, and entry or exit. Additionally, Summers may not offer opinion testimony on the nature and circumstances of the gunshot wound, including whether it was a contact or close contact wound and the distance of the gun from Minifield's head when it was discharged.

An appropriate Order will be entered.

Entered: July 15, 2022

Digitally signed by Michael F. Urbanski   Chief U.S. District Judge
Date: 2022.07.15 16:57:19 -04'00'

Michael F. Urbanski
Chief United States District Judge