IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| JACQUELINE Y. MINIFIELD, | ) | |
| as Administrator and Personal | ) | |
| Representative of the Estate of | ) | |
| D'LONDRE MINIFIELD and in | ) | |
| her Individual Capacity, | ) | Civil Action No. 5:17cv43 |
| | ) | |
| Plaintiff, | ) | |
| | ) | By:    Michael F. Urbanski |
| v. | ) | Chief United States District Judge |
| | ) | |
| STEPHANIE SILLS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This matter is before the court on defendant Stephanie Sills' Motion to Reconsider the Prior Ruling on Motion for Summary Judgment, ECF No. 241. The issues have been fully briefed, and argument was heard on July 27, 2022.[1] For the reasons set forth herein, because there is no evidence beyond speculation that Stephanie Sills fired the shot that killed D'Londre Minifield, Stephanie Sills' motion to reconsider is **GRANTED** as to Count Two, Excessive Force Used on D'Londre Minifield, and Count Six, Wrongful Death. Having painstakingly reviewed the deposition testimony, declarations, and exhibits from all witnesses, the court finds, consistent with its February 13, 2020, ruling, ECF Nos. 213 (Minute Entry from Proceedings), & 225 (Transcript of Proceedings), and March 3, 2020, memorandum opinion, ECF No. 218, that a genuine issue of material fact exists as to the location of D'Londre Minifield's body at the time of the gunshot causing his death. This issue of fact requires

---

[1] Argument on this issue was also referenced at the <u>Daubert</u> hearing held on June 30, 2022.

Stephanie Sills' Motion to Reconsider to be **DENIED** as to Count Three, Conspiracy to Deprive D'Londre Minifield of Rights and Privileges under 42 U.S.C. §1983.[2]

## I.

To see a detailed recitation of this case's procedural history prior to the March 2020 summary judgment motion, see the summary judgment memorandum opinion's procedural history section, Section "I." ECF No. 218 at 2.

On January 22, 2020, defendant Stephanie Sills filed a renewed motion for summary judgment, Mot., ECF No. 199, and Plaintiff filed a second motion to amend the fourth amended complaint to reallege Count Three and add back previously dismissed defendants. Mot., ECF No. 201. A hearing was held on these motions on February 13, 2020. Minute Entry, ECF No. 213. At the hearing, the court denied the renewed motion for summary judgment as to Counts Two and Six filed by defendant Stephanie Sills, reasoning that genuine issues of material fact existed as to the circumstances of D'Londre Minifield's death given the deposition testimony of witnesses Aaliyah Green, Kelly Grafton, and Kayla Friesen stating that they heard a gunshot and shortly afterwards saw D'Londre Minifield's body draped over a chain-link fence from which he was removed and placed on the ground by Winchester police officers. This account lies in stark contrast to the police officers' testimony that D'Londre Minifield, while lying on his stomach after stumbling, reached for a handgun and shot himself in the head.

---

[2] The Fourth Amended Complaint originally characterized this as a "§1985(3)" claim. However, the court in its order, ECF No. 219, explained that it **GRANTED** the request for the claim to be readmitted as a §1983 claim.

In its March 2020 opinion, the court affirmed and elaborated on the reasoning for its rulings in open court. The opinion specified that Stephanie Sills' motion for summary judgment was denied and that Plaintiff's request to revive Count Three against the previously dismissed defendants was denied. However, the court granted Plaintiff's request to reassert Count Three's claim alleging a conspiracy in violation of 42 U.S.C §1983 against defendant Stephanie Sills and unnamed co-conspirators. Stephanie Sills' motion for summary judgment was denied as to all three of these counts because of the court's view at that time that a genuine issue of material fact existed as a result of the two divergent accounts of the location of D'Londre Minifield's body after the fatal gunshot.

After the court issued its opinion, Stephanie Sills' counsel filed a notice of interlocutory appeal to the United States Court of Appeals for the Fourth Circuit challenging the court's summary judgment opinion and order. ECF No. 221. An order staying the case pending resolution of the interlocutory appeal was issued on March 16, 2020. Concurrently, while awaiting resolution, the parties unsuccessfully participated in a settlement conference. ECF No. 229.

The case remained at the Fourth Circuit until February 3, 2022, when the Fourth Circuit issued a five-page opinion dismissing the appeal for lack of jurisdiction to consider the arguments raised. Ct. of Appeals Mem. Op., ECF No. 233. The court immediately issued an order lifting and vacating the case's March 16, 2020, stay order. ECF No. 235. A scheduling conference was held in March 2022 to discuss the updated status of the case and a trial date was set for September 19-23, 2022, in Harrisonburg, Virginia.

In preparation for trial, Stephanie Sills filed a motion in limine to prohibit Plaintiff's proposed experts, Charles Feldbush and Jamie Summers, from offering opinions on the nature of D'Londre Minifield's gunshot wound because such an opinion required medical training, specifically in the field of forensic pathology. ECF No. 241. Appended to the motion in limine was a motion to reconsider the prior ruling on summary judgment. Id. Sills asked the court to reconsider the motion for summary judgment after considering the outcome of the Daubert hearing. ECF No. 242 at 10-11. Both parties fully briefed both issues, the motion in limine and motion for reconsideration. A Daubert hearing was held on June 30, 2022.

Following the Daubert hearing, the court issued an opinion granting Stephanie Sills' motion in limine. The court concluded that the proposed expert witness, Gerald Summers, could not offer opinion testimony based on an examination of D'Londre Minifield's gunshot wound as he lacked any qualifications to render what was essentially a medical pathology opinion. ECF No. 252.[3]

On July 27, 2022, the court held a hearing on Sills' motion to reconsider the prior ruling on the motion for summary judgment. Both parties were present and presented their arguments. ECF No. 254. Following the hearing, the court was in contact with all parties and requested the submission of various depositions and their respective exhibits.

---

[3] Prior to the Daubert hearing, Plaintiff notified the court and Defendant that the other proposed expert witness, Charles Feldbush, would not be offered to testify on the nature of D'Londre Minifield's wound or matters related to forensic pathology. See Def.'s Resp., ECF No. 244.

## II.

In the February and March 2020 decisions on summary judgment, the court ruled there were genuine issues of material fact as to Counts Two and Six that precluded summary judgment. The court stated:

> It's troubled me from the fact that you have a gunshot wound to a young man's head, that kills him, and the gun is somehow under his body. It doesn't make any sense to me.
>
> You have three witnesses now, three, say that there is a man -- a young man on the fence, they hear a shot, one says a taser is shot, one says a shot, and then they say --each of those people say the police pulled the young man off the fence, put him on the ground.
>
> The officers' story is very different, and that is he was running and he gets into this area between this wooden fence and this chain link fence, he's on the ground, he starts to reach for something, and somebody calls out "gun" and he shoots himself. Those are the facts that we're dealing with. I understand Ms. Judkins' argument about the close contact wound. I understand that, but I'm not convinced that that in and of itself – that's not the only material fact in this case. There is a material fact as to where he was when the shots were fired and how he got to the ground. Those are material facts, and there's a genuine issue as to that based on the testimony of Grafton, Green, and Friesen. There's a genuine issue of material fact whether . . . that young man was on the fence and how he was taken to the ground. That's a genuine issue of material fact that I find precludes summary judgment. I'm denying the motion for summary judgment in this case.

Mot. for Summ. J. Tr., ECF No. 225 at 74-75.

This excerpt of the transcript plainly describes the dilemma the court faced in 2020, the dilemma it faces today, and is the starting point for the rationale of its rulings. Whether D'Londre Minifield was on the ground or whether D'Londre Minifield was on the fence at the time of or immediately following the gunshot is plainly disputed. This dispute is shown by

the differing firsthand accounts provided by D'Londre Minifield's witnesses and the Winchester police officers. However, upon reexamination of all depositions and declarations alongside all submitted exhibits, both previously and newly submitted by request of the court, the court finds that this question of fact is material to only one of the three remaining counts, Count Three.

### III.

The reason for this conclusion is that there is no evidence, direct or circumstantial, that could lead a reasonable jury to conclude that Stephanie Sills, as opposed to D'Londre Minifield, a police officer other than Sills in the vicinity, or some other person, fired the shot that killed D'Londre Minifield. Because there is no evidence that Sills fired the fatal shot, any verdict on Count Two and Six would be entirely speculative. As such, dismissal of Counts Two and Six against Stephanie Sills is required.

In the prior summary judgment decision, the court focused on the disputed evidence as to the location of D'Londre Minifield's body. But what the court failed to note in 2020, but focuses on now, is that whether D'Londre Minifield was on the fence or on the ground at the time of the fatal gunshot, there is no way short of sheer speculation for a jury to find that Stephanie Sills fired the fatal gunshot.  Review of the material evidence in this case confirms the utter lack of evidence necessary to find Stephanie Sills liable for excessive force or wrongful death.

Lead Virginia State Police Investigator John Defilippi's investigative report shows that the firearms recovered from Officers Sills and Ivins, with serial numbers registered to Officers Sills and Ivins, were never fired. Defilippi Decl., ECF No. 152-7 at 4. Defilippi's report states

that these service weapons were turned over to the Virginia State Police on February 28, 2016, the day of the incident. Id. After the weapons were turned over, testing on Sills' and Ivins' Glock 22 pistols showed that the firearms each were loaded with one round in the chamber and fourteen rounds in the magazine. Id. This meant the firearms were considered fully loaded or not to have been discharged because they have a magazine capacity of fifteen rounds. Id. While Plaintiff posits speculative theories about officers switching weapons, that is utter speculation. Other than sheer speculation, there is no evidence that Stephanie Sills fired her service weapon.

The revolver recovered on the scene was also tested to determine its relevance to the events surrounding D'Londre Minifield's death. The revolver was found covered in D'Londre Minifield's blood. Id. Forensic testing of the blood found that D'Londre Minifield could not be eliminated as a contributor to the blood DNA profile and the probability of the blood DNA profile returning results that were inconsistent with D'Londre Minifield or someone related to him was 1 in greater than 7.2 billion. Id. at 57.

The day after Minifield's death, Investigator Defilippi conducted a search of the area in an attempt to recover any bullets or other items of evidence that were left on the scene. Id. at 6. No items were located until D'Londre Minifield's family shared a bullet they recovered from the scene days later. Id. This bullet was submitted to the Commonwealth of Virginia Department of Forensic Science Manassas Lab for comparison to the revolver recovered to determine if it had been fired from the weapon. The Commonwealth of Virginia Department of Forensic Science microscopically examined the bullet and identified it as having been fired from the revolver recovered. Id. at 58.

Moreover, there is no testimony or other evidence indicating that any Winchester police officer fired a gunshot at D'Londre Minifield, much less that Stephanie Sills fired a gunshot. Sills was questioned in her deposition about whether she shot D'Londre Minifield or discharged her weapon.

Q. Did you shoot Mr. Minifield?

A. No.

Q. Did you discharge your firearm at all that day?

A. No.

Q. Did the State Police take possession of your firearm to test it?

A. Yes.
….
Q. Did you see any officer employed by the City of Winchester

shoot Mr. Minifield?

A. No.

Sills Dep., ECF No. 200-3 at 115, 116.

Christopher Ivins, the officer accompanying Sills, likewise was questioned in his deposition about whether his gun was fired.

Q. Did you discharge your firearm?

A. I did not.

Q. Why not?

A. I didn't have time.

Q. You didn't have time because what happened?

A. Because he shot himself.

Ivins Dep., ECF No. 152-31 at 111.

Later in the same deposition, Ivins was questioned about the matter again and asked whether any officer was observed discharging their weapon.

> Q. Did State Police take possession of your firearm that you had on you that day?
>
> A. Yes, Ma'am.
>
> Q. Did you discharge your firearm at all that day?
>
> A. No, Ma'am.
>
> Q. Did you see any police officer discharge their firearm that day in the vicinity of Mr. Minifield?
>
> A. No, Ma'am.
>
> Q. Did you shoot Mr. Minifield?
>
> A. No, Ma'am.

Id. at 157.

Kristen Bradford, an off-duty sheriff's deputy who observed the fighting incident near 2239 Roosevelt Boulevard which sparked this tragic episode, was one of the first officers on the scene after Ivins and Sills. Bradford testified at her deposition to seeing Officer Sills holding her Taser, but not her firearm, when she arrived on the scene.

> Q. So you came around that bottom side of the church –
>
> A. Uh-huh.
>
> Q. -- and saw Sills standing there?
>
> A. Yes.
>
> Q. And what was she doing?

9

A. She had her TASER in her hand.

Q. Anything else?

A. No.

Q. And was she just standing there?

A. Yeah. At that point.

Q. Was she running? Standing? What was she doing?

A. No, I think she was just standing there at that point.

Q. Okay. All right. And what was the next thing that you saw? Did you talk to her?

A. I'm sure we said something. I don't remember if we said anything at all. I think I looked -- she was just staring. And then I – that's when I looked over and saw -- saw him on the ground.

Bradford Dep., ECF No. 256-2 at 145-146.

Plaintiff's witnesses, Kelly Grafton, Aaliyah Green, and Kayla Friesen, were also deposed. While their accounts differ significantly with police witnesses as to the location of Minifield's body immediately following the gunshot, none of these witnesses saw who fired the fatal gunshot because they were in front of the house at 2336 Wilson Boulevard when the gunshot was fired, and that house blocked their view of D'Londre Minifield.

In deposition, Kelly Grafton stated that she saw officers approach D'Londre Minifield after the gunshot, but did not witness how the fatal gunshot was fired.

Q. And where did you see the police officers?

A. Like – they were like right here. They were walking up – like they were coming up
…
A. … I think they come around because there was ones there with the guns drawn.

10

Q. And you say other officers came from what direction?

A. The one officer that was chasing them was going around. We seen – I seen the ones – I just seeing them standing, like walking towards him.

Q. With guns drawn?

A. Yes, ma'am

Q. How many officers?

A. I can't remember how many. But at least two to three maybe. I don't remember like I said –
…
Q. And when you saw them walking in that direction, was it after you heard the noises?

A. Yes, ma'am.

Q. And what – what were they walking toward?

A. Walking toward the man that was on the fence.

Grafton Dep., ECF No. 180 at 39-41.

Q. Okay. But for seeing any other officers actually near D'Londre, when you heard the shot, did you see any officers near him when you heard the shot?

A. I didn't – no. Like I said, when I heard the shot, I was…

Q. Okay. Did you see the officers who were approaching, the ones you've identified in photograph 10 – did you see from the time they came into your vision them discharge their weapon at any time?

A. I didn't see no discharge of a weapon.

Id. at 49-50.

Q. Okay. And so you stated that you saw D'Londre's body hanging over the fence, correct?

A. Yes, sir.

Q. Did you see any weapons or firearms around him?

A. No, sir.

Q. Okay. How long did you see him hanging on the fence before the officers arrived?

A. I can't say how long exactly. I just know we came around the house, and that's when we seen them. And they were walking – as we come around the house, we seen them. And that's when they were approaching him.

Q. Okay. But you saw him without anybody around him to begin with, correct?

A. For – yeah, for probably about a second or so. And that's when they were approaching like slow – I mean they were not running but slowly guns approaching.

Id. at 66.

Aaliyah Green's deposition testimony does not support the allegation that Officer Sills discharged her weapon at D'Londre Minifield.

Q. Right. And do you know who – tell me what you saw. Describe what you saw.

A. I just seen like somebody – it was like he was laid over. But it looked like he was trying to climb up the fence in the process. So it was like he literally was literally at the top like laid over the fence.
…
Q. Did you see any officers in this field – this particular area?

A. I didn't – I didn't see any officers. It was like they all came at the same time. The only officers I really seen was the two that were standing.

Q. Over on the other side?

A. Yeah. But as soon as like all that happened, a bunch of cop cars – there was like sheriffs, state police and Winchester cop cars were parked back here. Like three – I think it was like three or four of them came out of nowhere with their guns held and took him off the fence.

Q. You saw that?

A. Yeah.

Q. Took him off the fence?

A. Yeah. And laid him on the ground.

Green Dep. ECF No. 179 at 67-68.

Q. But no police officers in your line of sight?

A. No. I didn't see any.

Q. Okay. And so – and when you saw police officers, there were approximately four of them together approaching him?

A. Yeah. Yes.

Q. Don't know what the sex were, whether they were all men or whether they were a mixture of men and women.

A. No
…
Q. All right. When you saw them approaching where you say D'Londre was on the fence, the gunshot – you had already heard the gunshot?

A. Yes.

Q. From what direction did the gunshot that you heard come from?

A. Like Orchard Crest.[4]

Id. at 113-14.

_____

[4] It is undisputed that Officer Sills was not in the area of the Orchard Crest apartments.

Q. When Dre was laying on the fence, where did the police officers come from?

…

Did they come from Orchard Crest?

A. No. They came from the back,

Q. The back?

A. Yes

Q. Okay.

A. There's a – like behind where – this is the parking lot where it is. They were all coming from this way.

…

Q. In other words, you testified that there was police officers – or at least, Quay and Kayla said there was police officers on the field on the other side of these fences.

A. There was. There was two of them.

Q. How would they have got then over here?
    [Ms. Judkins: Objection to the form.]
    [By Mr. Pollack]
Q. Or did you see them go from that field to this point?

A. I don't – no. I didn't see them move at all.
They would have had – if they would have – they would have had to come past us over there in order for them to get --

Q. Or hop another fence going the other way?

A. Yeah, or the other way.

…

Q. But do you know how they got there?

A. No.

Id. at 120-121.

Nor could Kayla Friesen's testimony support a jury verdict against Stephanie Sills on Counts Two and Six. Not only did Friesen not witness the firing of the fatal gunshot, she testified that she saw a female officer holding a Taser rather than firearm.

> Q. Did you see who shot D'Londre?
>
> A. No.
>
> Q. And when you saw D'Londre on the fence, he was by himself?
>
> A. Correct.
>
> Q. And the officer who pulled him off the fence came from either where you've got the Xs behind the church or the ones who were chasing him?
>
> A. Right. And by the time me and Quay got to the fence right here, these two officers were already on D'Londre.

Friesen Dep., ECF No. 256-1 at 11.

> Q. You never saw at any time any gun actually come in contact with D'Londre's head?
>
> A. No. But if he shot himself, I'm sure he's not going to shoot himself in the back of the head.

Id. at 14.

> …
> Q. No, no, no, let me back up. It's correct, you never saw anyone holding a gun to D'Londre's head and shoot; correct?
>
> A. No. That's how I knew he didn't kill himself. Keep going.
>
> Q. That's how you knew he didn't kill himself because you never saw a gun held to his head?
>
> A. Well, if we -- we would have seen that -- we would have seen him kill himself if he was just sitting there holding a gun to his head.

Id. at 15.

15

Q. Well, let me ask you, going off of that, "Friesen further advised that she saw a female officer with her gun out and she heard the shot, but it was not the officer she saw who shot." Do you see that sentence?

A. Yeah. See, when I seen her with that out, I also said that it wasn't a gun because we knew that for sure after the Taser went off. It did look like a gun at first until I heard the Taser go off. By the time I got out of the car I already knew it was a Taser. I didn't see a gun in her hand, but she did still have the Taser in her hand. So no, it was not a gun.

Q. All right. So for this sentence who you were talking about is the female officer you say had the Taser and shot off the Taser –

A. Yes.
…
Q. All right. And then it says she did not physically see who fired the shot; is that correct? You told them you didn't see who fired the shot?

A. Just like I told you, I don't know who physically shot that gun off.

Id. at 16.

In sum, there is no testimony or other evidence creating a genuine issue of material fact that Stephanie Sills fired a gunshot at D'Londre Minifield. In their depositions, the first two officers on the scene, Sills and Ivins, state that no police officer discharged a firearm. Sills and Ivins's service weapons were taken and tested by Virginia State Police and found not to have been discharged. Both police weapons contained their entire ammunition clips and no bullets were missing. Deputy Bradford testified that she did not see Officer Sills fire her gun. Moreover, Deputy Bradford testified that she did not see Officer Sills' gun in Officer Sills' hand. Deputy Bradford testified that she only saw Officer Sills wield her Taser.

Considered in the light most favorable to the Plaintiff, the Grafton, Green, and Friesen testimony do not establish any culpability on Sill's part for excessive force or wrongful death,

16

and it would be completely speculative for a jury, faced with this record, to conclude that Sills was responsible as alleged in Counts Two and Six. Because their vision was blocked by the house on Wilson Boulevard, none of these three were able to see the gunshot. Each saw a number of officers approach D'Londre Minifield draped over the fence, but none of these witnesses could support a reasonable jury verdict against Stephanie Sills for excessive force or wrongful death beyond sheer speculation.

Furthermore, in addition to the lack of evidence that Officer Sills' or another Winchester police officer's gun was fired, D'Londre Minifield's autopsy report, completed by Dr. Francis P. Field, M.D., reports that D'Londre Minifield's death was the result of a contact gunshot wound to the right side of his head and the manner of death was suicide.[5] Field's Report, ECF No. 200-1 at 7. To reach this conclusion the report says the "Evidence of Trauma" was:

> GUNSHOT WOUND: Perforating gunshot wound with entrance on right side of head behind the ear at approximately 3 1/4" below the top of the head and 8" right of the anterior midline; 1/4" round hole with marginal lacerations 1/8" to 1/2" making the stellate wound 3/4" overall. There is soot at the wound margins and in underlying subcutaneous tissue. The hemorrhagic wound passes upward, forward and leftward perforating the lateral right parietal bone that shows soot on the sharp outer table margin and inner table beveling, continues perforating the right temporal and parietal to the left frontal lobes of the brain and the anterior left frontal bone that shows sharp inner table margin and beveling of the outer table margin to exit the left forehead at approximately 2" below the top of the head and 2" left of the anterior midline through a 5/8" slit-like wound. There are fractures extending from the entrance defect onto the lateral right temporal, occipital, parietal and frontal bones; and

---

[5] The summary section of the autopsy report references that Dr. Field was informed of the police officers' account of events because it said, "[t]he decedent reportedly shot himself during apprehension by police."

fractures extending from the exit defect onto left frontal, parietal and temporal bones.

Id.

The defense stresses Dr. Field's conclusion that this was a contact injury, and correctly emphasizes that there is no witness placing any officer, including Stephanie Sills, close enough to D'Londre Minifield to have fired a gun in contact with his head. When asked how far she was from D'Londre Minifield at his time of death, Stephanie Sills responded, "[I was] [w]ithin 20 feet; I would say approximately 15 feet." Sills Dep., ECF No. 200-3 at 78. Officer Ivins said he was a "full first down"[6] from D'Londre Minifield at his time of death. Ivins Dep., ECF no 152-31 at 115. Deputy Bradford testified consistently that Officer Sills holding her Taser some distance away from D'Londre Minifield when she arrived on the scene. See Bradford Dep., ECF No. 256-2 at 199-201 (referencing Officer Bradford's use of deposition exhibits to mark observed officer locations).

Although Plaintiff's witnesses Grafton, Green, and Friesen did not witness the gunshot, they viewed D'Londre Minifield's body on the fence shortly thereafter. None of these witnesses place Stephanie Sills or any officer close enough to D'Londre Minifield to fire a gun in contact with his head. Grafton testified that she watched officers approach D'Londre Minifield and take him off the fence after she heard the gunshot. Grafton Dep., ECF No. 179 at 65. Green testified that she saw officers approaching D'Londre Minifield after she had already heard a gunshot. Green Dep., ECF No. 179 at 112. Consistently, Friesen testified that she saw D'Londre Minifield on the fence by himself for a few moments before being pulled down by officers. Friesen Dep., ECF No. 256-1 at 44. Friesen testified that she did not see a

---

[6] Generally known as 10 yards.

gun come in contact with D'Londre Minifield's head. Cumulatively, all this testimony supports the defense argument no police officer was close enough to render a contact gunshot wound to D'Londre Minifield.

The court notes that the medical examiner, Dr. Field, was neither deposed nor submitted an affidavit or declaration stating his opinion that this was a contact wound and suicide. The defendant's retained forensic pathology expert opinion is based on the findings in Dr. Field's autopsy report. Thus, while the defense asserts that the issue of a contact wound is undisputed, the court finds that this will depend on the testimony of the medical examiner at trial. The court recognizes that Plaintiff has no expert that is permitted to testify on this issue, but until the medical examiner testifies under oath, the court is not in a position to conclude that the issue of a contact wound is dispositive of all of the claims in this case.

Regardless of whether D'Londre Minifield was on the fence or on the ground when he suffered his fatal gunshot wound, the court's fulsome review of all of the evidence in this case requires it to conclude that no reasonable jury could conclude that Stephanie Sills fired the fatal gunshot. Lacking any evidence, Plaintiff offers only speculation. As a result, the Motion to Reconsider Summary Judgment as to Count Two and Count Six must be **GRANTED** and those counts must be dismissed against Stephanie Sills.

## IV.

While there is no evidence from which a reasonable jury could conclude that Stephanie Sills fired the fatal shot, the court's review of the depositions and exhibits support its view at this stage of the proceedings that the differing accounts and locations of D'Londre Minifield's body create a genuine issue of material fact relevant to Count Three's conspiracy claim. Taking

the evidence in the light most favorable to the plaintiff, the conflicting stories on the location of D'Londre Minifield's body, whether it was on the fence versus on the ground, support a plausible claim that the police misled the public on details surrounding D'Londre Minifield's death. While this issue may be resolved at trial following the testimony of the medical examiner regarding the nature of D'Londre Minifield's fatal gunshot wound, the claim of a conspiracy to cover up a police shooting cannot be resolved at this procedural stage. Accordingly, the court is required to **DENY** the motion for reconsideration as to Count Three at this point.

## V.

For these reasons, the court concludes that Stephanie Sills' Motion to Reconsider the Prior Ruling on the Motion for Summary Judgment is **GRANTED** as to Count Two and Count Six and **DENIED** as to Count Three. The case will proceed to trial against defendant Stephanie Sills under the § 1983 conspiracy claim in Count Three. There is no reason to delay the present trial as the § 1983 conspiracy claim relies on the evidence already in the record and the cover-up allegations have long been a part of this case. The trial will continue as scheduled on September 19-23, 2022.

An appropriate Order will be entered.

Enter: This 12th day of August, 2022

Digitally signed by Michael F.
Urbanski       Chief U.S. District
Judge
Date: 2022.08.12 20:15:55 -04'00'

Michael F. Urbanski
Chief United States District Judge