IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| JACQUELINE Y. MINIFIELD, | ) | |
| as Administrator and Personal | ) | |
| Representative of the Estate of | ) | |
| D'LONDRE MINIFIELD and in | ) | |
| her Individual Capacity, | ) | Civil Action No. 5:17cv43 |
| | ) | |
| Plaintiff, | ) | |
| | ) | By:    Michael F. Urbanski |
| v. | ) | Chief United States District Judge |
| | ) | |
| STEPHANIE SILLS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This matter is before the court on plaintiff's motion to set aside the jury verdict and

for a new trial, ECF No. 309, and request for hearing on the motion for new trial, ECF No.

311. Defendant opposes both motions. See ECF Nos. 312, 314, and 318.

After several years of pretrial development, this case was tried before a jury in

Harrisonburg for five days between September 19–23, 2022.  The case went to trial on one

claim: a conspiracy by Winchester police officers and others to deny the Estate of D'Londre

Minifield ("the Estate") access to the courts in violation of 42 U.S.C. § 1983 as a result of the

alleged police shooting of D'Londre Minifield ("Minifield"). The lone remaining defendant,

Winchester police officer Stephanie Sills ("Sills"), denied that any police officer shot and killed

Minifield and that there was a conspiracy to cover up the alleged police shooting. After five

days of trial, the jury was presented with a series of special interrogatories, the first of which

asked: "Has the plaintiff proven by a preponderance of the evidence that D'Londre Minifield

was shot and killed by a police officer?" The jury answered "No" to this question, and the court entered judgment for defendant Sills.

As the jury had a full opportunity to consider the evidence and arguments raised in this case and concluded that the Estate did not meet its burden of proof, the motion to set aside the verdict and for new trial is without merit. Nor is there any reason to convene an evidentiary hearing as the persons identified in the post-trial letter to the court, Josh and Davon Brown, have been known to all since the events surrounding Minifield's tragic death. Accordingly, the Estate's motions to set aside the jury verdict and for new trial and its request for an evidentiary hearing, ECF Nos. 309 and 311, are **DENIED**.

## I.

Over the course of the five-day trial, the jury heard from witnesses at or near the scene of the shooting, considered forensic evidence, heard from the Virginia State Police concerning its investigation of the incident, and heard testimony from the state medical examiner who performed an autopsy. The Estate called many of the police officers involved in the events of February 28, 2016, as witnesses in its case.[1]

Kristin Bradford ("Bradford"), an off-duty Frederick County Sheriff's deputy, testified that she witnessed a fight involving the brandishing of a firearm in front of a townhouse on Roosevelt Boulevard in Winchester, Virginia. Bradford Trial Test. Tr., ECF No. 322, at 6–7. Bradford called 911, and Winchester police officers Andrea Enke ("Enke")[2] and Travis

---

[1] There was no police body camera or dash camera video of the incident. Enke Trial Test. Tr., ECF No. 322, at 104.

[2] Andrea Enke subsequently was married and took the name Andrea Lutz. For clarity, the court will refer to her by her maiden name.

Medina ("Medina") arrived at the scene. Id. at 11. Hearing on police radio of a nearby foot pursuit, Enke, Medina, and Bradford ran in that direction. Id. at 11–13, 52. While in foot pursuit, Bradford heard over the radio that the subject was reaching for his waistband and shortly after heard a single gunshot. Id. at 17. A few seconds later, after rounding the corner of a church building, Bradford saw two police officers standing and a subject, later identified as Minifield, on the ground. Id. at 23–24. Bradford recognized Sills as one of the standing officers and checked on her to see if she had been shot. Id. at 24–25. Bradford testified that Sills was 20–25 feet from Minifield and had her Taser deployed. Id. at 38–39. Bradford then approached Minifield who was on the ground near a chain link fence and saw a female officer roll him over and start chest compressions. Id. at 25–26. Bradford testified that Minifield had a gunshot wound to his head. Id. at 26. Bradford helped other officers put up police tape around the area. Id. at 27. Bradford made no mention in her police report of seeing a gun on the ground, being moved, or picked up.[3] Id. at 36. Bradford did not see Minifield on the chain link fence or any officer attempting to pull him off of it. Id. at 45.

Medina testified that he was dispatched to a disturbance on Roosevelt Boulevard in Winchester involving several individuals and a firearm. Medina Trial Test. Tr., ECF No. 322, at 48. While gathering information on the scene, Medina learned that Josh Brown was involved in the incident. Id. at 49. After learning that the suspects had left the scene, id., Medina heard two other officers mark out on a foot chase in the 2500 block of Wilson Boulevard.[4] Id. at 50.

---

[3] On cross-examination, Bradford stated that she did not recall one way or the other whether there was a gun on the scene on the ground that caused Minifield's injury. Bradford Trial Test. Tr., ECF No. 322, at 36. Bradford testified that after February 28, 2016, she left the Sheriff's office on disability stemming from a traumatic brain injury sustained during a motor vehicle accident causing her some memory issues. Id. at 37–38.

[4] Medina explained that to "mark out on a foot chase" meant in layman's terms that the officers were engaged in foot pursuit of a suspect. Medina Trial Test. Tr., ECF No. 322, at 50–51.

Medina and Enke, his partner, then headed off on foot south on Roosevelt Boulevard. Id. at 53. While running, Medina heard a single gunshot. Id. at 55. When he arrived on the scene, Medina saw an individual, later identified as Minifield, face down. Id. Medina described officers tending to Minifield and saw them detain him, flip him over and start medical treatment. Id. Medina recalled Sills, Sergeant Brian King ("King"), Officer Christopher Ivins ("Ivins"), and Corporal Michael Brunson ("Brunson") being present. Id. at 55, 57. Medina took on the role of controlling the scene. Id. at 56.  Medina heard radio traffic concerning a self-inflicted gunshot wound. Id. at 58. Medina was asked whether his written report mentioned him witnessing the recovery of a firearm, and Medina responded that it was not his role. Id. at 58–59. On cross-examination, Medina described his role as putting up crime scene tape to make sure individuals could not get to the area and was not tasked with searching for a gun, drugs, cell phones, or other personal items. Id. at 59–60. Medina explained that he put in his report what he did. Id. at 60. Medina testified that when he arrived, Minifield was not on the chain link fence, but was lying on the ground. Id. at 61.

Enke responded with Medina to the 911 call regarding a fight with a possible gun involved on Roosevelt Boulevard. Enke Trial Test. Tr., ECF No. 322, at 98. Enke was told about a suspect who had left the scene described as a Black male wearing a jean jacket with a gun in his sweatpants. Id. at 99–100. Enke heard Officer Marti Harvey ("Harvey")[5] radio that she was in foot pursuit of a male subject. Id. at 100. Enke noted that Harvey was three to four blocks away running in Enke's direction. Id. at 101. Enke testified that they started running in

---

[5] Two officers present during the encounter, Christopher Ivins and Marti Harvey, were subsequently married. For clarity, the court refers to Marti Ivins by her maiden name, Marti Harvey, in this opinion.

that direction. Id. Enke trailed Bradford and Medina and, while running, heard one gunshot. Id. at 102, 108, 110–11. When she arrived at the scene, Minifield was on the ground facing up and King was doing CPR. Id. at 115–16. Enke did not see anyone remove a gun from underneath Minifield and was not responsible for looking for a gun in his vicinity. Id. at 117. Rather, she helped tape off the scene to keep onlookers back. Id. at 117, 119. Enke testified that Brunson recovered and secured a revolver, which Enke photographed and placed in an evidence bag. Id. at 119. Enke identified for the jury the photographs she took of the revolver, which had blood and dirt on it. Id. at 121–22. Enke testified that Brunson opened the revolver to secure it, and Enke noted that there were four cartridges in the chamber, one of which had been fired. Id. at 123.

Officers Anna Shelton ("Shelton") and Harvey saw Davon Brown and another individual walking near the 2500 block of Wilson Boulevard and stopped them. Shelton Trial Test. Tr., ECF No. 322, at 67. Shelton testified that she heard Medina call out on the radio that Josh Brown was involved in the Roosevelt Boulevard disturbance, and Shelton knew Davon and Josh Brown were brothers. Id. at 67–68. When Shelton got out of her patrol car to talk with them, the person—later identified as Minifield—immediately put his hands in his pockets. Id. at 71–72. Shelton testified that "[h]e appeared to me like he was reaching for a firearm. I asked him to stop, show me his hands, and he took off running." Id. at 74. Shelton gave chase and last recalled seeing Minifield running in a field northeast towards Grace Community Church. Id. at 77–78. Shelton saw Minifield change directions to the west, apparently in response to an approaching police car. Id. at 80–81. Shelton observed Officer Christopher Ivins with his gun drawn on the other side of a fence. Id. at 81. Shelton did not

see Minifield jump a fence. Id. at 84. At this time, Shelton was with Brunson. Id. at 82. After

hearing a gunshot, Brunson ran toward the scene and Shelton followed, in her words, "way

behind him." Id. at 83–85. When Shelton arrived on the scene, she assisted King with rolling

Minifield over. Id. at 85. When asked why her report did not mention recovering a firearm,

she explained that "I'm sure they secured that before I got there." Id. at 87. On cross-

examination, Shelton testified that she did not see anything under Minifield when he was rolled

over and did not see what Brunson did before she got there. Id. at 90. Shelton testified that

the first safety protocol for officers arriving at the scene of a gunshot is to secure the firearm

and make it safe, which would have been done before CPR was initiated. Id. Shelton was not

involved in evidence collection on the scene, and her report reflected what she did. Id. at 92.

     Harvey was riding in a patrol car driven by Shelton when they responded to a radio call

about a fight involving a firearm.[6] Harvey testified that she observed Davon Brown and

another male later identified as Minifield in the parking area of the apartments off of Wilson

Boulevard. Harvey and Shelton exited the patrol car and asked the two men to come and speak

with them. Brown complied, but Minifield kept walking away with his hands in his pockets.

Minifield turned and smiled at the officers and began to run away. Harvey and Shelton marked

in foot pursuit. After Minifield entered the apartment complex, Harvey lost sight of him and

returned alone to the patrol car. Shelton continued the foot pursuit. Harvey drove north in

the direction where Minifield and Shelton were running. After stopping the police car, Harvey

arrived at the scene and saw Shelton and King. Harvey saw Minifield on the ground facing

---

[6] Harvey testified at trial by video deposition on September 20, 2022. The videotaped de bene deposition is located on Box.com.

down. Harvey did not see Minifield on a fence or being pulled off a fence. Harvey saw an officer handcuff Minifield and roll him over. King started CPR. Harvey testified that she approached Minifield and was close enough to touch him when she observed a firearm underneath him. Harvey described the firearm as a small revolver with a wooden handle and identified a photograph of the revolver for the jury. Harvey said that the revolver had a red stain consistent with blood and remembered a pool of blood on the ground. Harvey testified that the gun she saw under Minifield was not a standard Winchester Police Department Glock service weapon. Harvey testified that she did not see any officer place a firearm under Minifield, nor did she see any Winchester police officer discharge their firearm. Harvey recalled seeing Taser wires. Sergeant King asked Harvey and Shelton to locate Davon Brown to further the investigation.

King testified that he was on patrol when he responded to a radio call from dispatch about a fight possibly involving a gun. King Trial Test. Tr., ECF No. 323, at 116, 119. King recalled the radio traffic about foot pursuit and responded to the area. Id. at 119. King parked his car near the back of Grace Community Church and saw officers in the grassy area around the back of the church. Id. at 124–26. After rounding a corner, King saw Sills and Ivins holding what appeared to be guns and a man lying on the ground. Id. at 126–27. King turned his attention to the man on the ground. Id. at 132. As the man's hands were under him, officers pulled them out. When Minifield's arms were pulled out from under him, King testified that "I could see what was part of a gun partially underneath him." Id. at 134. King said that the gun was under the torso part of his body. Id. King identified for the jury photographs of the gun he saw lying under Minifield. Id. at 141–42. King checked for a pulse and detected one.

Id. at 135. He then rolled Minifield over and started doing chest compressions, which he continued until Fire and Rescue personnel arrived. Id. Once Minifield was rolled over, he could see the gun with blood on it. Brunson picked up the gun, took it away, and secured it.[7] Id. at 141.

Officers Ivins and Sills were the only officers present at the time of the gunshot. Ivins and Sills responded by patrol car to the radio calls concerning a fight possibly involving a gun. Sills Trial Test. Tr., ECF No. 323, at 15. The officers saw a figure—later identified as Minifield—running away, id. at 25–26, and Sills stopped the patrol car in a parking lot near a church, id. at 28. Ivins exited the car first and began running after Minifield. Id. at 29. Sills followed and saw Minifield trip and fall near a snowbank. Id. at 29–30. She testified that Minifield went down and used his hands for balance and continued to scramble. Id. at 30. Minifield came to rest face down on the ground near a chain link fence with his left hand under him. Id. at 31–32. Sills testified that Ivins gave him commands to show his hands, but Minifield did not do so. Id. at 32. Sills deployed her Taser at Minifield.[8] Id. Within seconds, Ivins yelled "gun" which was immediately followed by a gunshot from in front of her. Id. at 50. Ivins radioed "shots fired." Id. at 53, 55. Within five to fifteen seconds, other officers began to arrive. Id. at 63–64. Ivins, King, and Brunson approached Minifield, id. at 70, while Sills struggled to get a stuck cartridge out of her Taser, id. at 71. Sills testified that Minifield was handcuffed, rolled over, and CPR started. Id. at 70, 74. Sills testified that she did not see

---

[7] No trial testimony was received from Brunson as he passed away before trial.

[8] Counsel for the Estate questioned Sills intensely as to whether she had her gun drawn when she deployed the Taser based on the wording in Sills' police report. Sills Trial Test. Tr., ECF No. 323, at 106–07. Sills testified that she did not fire her service revolver. Id. She stated that she put her gun in her holster and simultaneously drew out her Taser. Id. at 106. Sills testified that once her Taser came out, her service weapon remained holstered until she turned it over to the Virginia State Police later that evening.  Id. at 51.

a revolver at the scene, id. at 90, nor did she see anyone place a gun under Minifield, id. at 107. Sills testified that neither she nor Ivins fired their Glock service weapons. Id. at 58–61, 95, 102. Sills testified that Minifield never made any attempt to climb the chain link fence, and no officers pulled him off the fence. Id. at 97. After Sills left the scene, she returned to the police station to be interviewed by the Virginia State Police. Id. at 109.

Ivins testified that he served as Field Training Officer for Sills on February 28, 2016.[9] Ivins testified that he and Sills heard over the radio that officers had been dispatched to an assault possibly involving a firearm. Ivins and Sills responded in their patrol car and heard that officers were in foot pursuit. Ivins saw a Black male running north through the field behind apartments near Wilson Boulevard. Sills pulled the patrol car into a church parking lot, and Ivins exited the patrol car, began chasing Minifield on foot, and yelled for him to stop. Ivins noticed that Minifield appeared fairly tired and was having trouble keeping his legs underneath him. Ivins stated that Minifield was reaching around with his right hand towards his waistband area. Ivins testified that Minifield ran around a snowbank at the edge of the asphalt and stumbled and fell in the grass. Ivins yelled numerous times to Minifield to show his hands, and Minifield began to crawl towards a chain link fence. Ivins saw Minifield digging in his waistband or pockets, and Minifield did not respond to multiple commands to show his hands. Minifield made eye contact with Ivins and produced a revolver from his jacket, waistband, or pants pocket on the right side of his body. Ivins yelled "gun." Ivins saw the gun briefly come up over the Minifield's back and move up towards his head. Ivins testified that Minifield broke

---

[9] Ivins testified at trial by video deposition on September 20, 2022. The videotaped de bene deposition is located on Box.com.

eye contact with Ivins and looked away. Ivins heard a muffled gunshot and saw Minifield's head jerk. At that time, only Sills and Ivins were in the vicinity and neither of them fired their police firearms. After the single gunshot, Ivins noticed probes from Sills' Taser. Ivins was approximately 20–25 feet from Minifield when he heard the gunshot. At the time of the gunshot, Minifield was on the ground, and at no time had been on the chain link fence. Ivins radioed that a shot was fired and approached Minifield once other officers arrived. Brunson and King were the first to arrive. When Ivins approached Minifield, he was face down. Ivins handcuffed Minifield and assisted in rolling him over. Ivins saw a revolver in the area of Minifield's upper chest and head. Ivins identified photos of the revolver for the jury and testified that it was covered in blood and dirt. Ivins did not touch or move the revolver, which was secured by Brunson. Ivins testified that the revolver was not a standard Winchester Police Department service weapon. While Ivins saw blood on the ground, he did not see any blood on the chain link fence. Ivins heard only one gunshot and did not see any Winchester Police officer discharge their weapon. Nor did Ivins hear that any Winchester police officer had discharged their weapon. Ivins took some photos at the scene and was transported to the Winchester police department where he prepared a report and was interviewed by a Virginia State Police investigator.

Erin Malloy ("Malloy"), Emergency Communications Director for the Winchester Police Department, testified about records kept by the police department concerning 911 calls and police radio traffic. Malloy testified about a Computer Aided Dispatch report, which logged police radio calls. During her testimony, the 911 call about the incident and related police radio traffic were played for the jury.

Aaliyah Green ("Green") testified that she was dating Davon Brown and knew Josh Brown and Minifield. On February 28, 2016, Green was living in an apartment with Kayla Friesen ("Friesen") across from the Orchardcrest Apartments on Wilson Boulevard. Green testified that, while Minifield smoked marijuana, she did not know him to use cocaine. Green Trial Test. Tr., ECF No. 297, at 10. Green testified that she was at the Buffalo Wild Wings in Winchester with Kelly Grafton ("Grafton"), who at the time was dating Josh Brown. Id. at 11–12. Green stated that Josh and Davon Brown and several others got into a fight. After a woman across the street yelled that she was calling 911, Green and Grafton walked away back towards their apartment. Id. at 13. Green testified as follows:

> So we were walking from the fight. We went down Taft and then we went down Wilson Boulevard, and we got about like halfway down the street it's like a sharp turn. But right before the sharp turn, as we're walking, we just see somebody run past and then a cop running behind them and then a cop car coming towards us. So we're not even knowing what's going on thinking that they are going towards the fight. So we just keep walking.
>
> Then after we get but so far, the next thing you know, like we see, well, D'Londre running through the grass, and then it was like cut off because there's a house and we couldn't see anything that was going on.
>
> And then next thing you know we hear a gunshot. And literally like once we hit the corner, we see him jump like on top of the fence, but like leaned over, like scrunched over, like he was going to jump over the fence but he didn't actually get to jump.

Id. at 13–14. Green testified that the figure was hanging on the fence and "looked dead." Id. Green testified that she saw "the police grab him off the fence and like throw him to the ground." Id. at 14–15. Green testified that after she heard the gunshot that she saw someone hanging over a fence but not moving. Id. at 36. Green testified that "it was like he was dangling

11

over, I would say. Head down one way, feet down the other way, but head facing towards us, feet towards the way we were going." Id. Green continued:

> We went to walk towards where he was at to see who he was. And then as we're walking towards it, I want to say—yeah, it was about—there was a million cops, but one cop walked towards us and told us to stay back, stay back, no, you can't go. Like no. We're just crying. We're trying to figure out who it is, like who is this person, like we need to know, basically. And they were like, No, no. And it's like another cop, two cops grabbed him off the fence and put him on the ground, like literally like slammed him on the ground, honestly, I guess thinking he was still alive. So they were like checking his pockets, and then one cop walked off. It was like not even no CPR, no anything like that that I remember seeing. And then we're still trying to go towards to see who it is, but they literally like had—it was like—it felt like maybe five minutes of hell, honestly, but it was like maybe two to three minutes in it felt like they—they had one guy come and tape up the area, so we couldn't even go across.

Id. at 38–39. Green testified on cross-examination that she was upset because the person on the fence had the same sort of dark clothing that Davon Brown was wearing and that she actually thought it was Davon. Id. at 60. Green realized that the victim was not Davon when Davon called her on her phone while she was standing there. Id. at 39–40. After Green left the scene, she saw Davon in a police car at her apartment. Id. at 40.

Designated portions of the deposition of Kayla Friesen were read to the jury. Friesen testified that she and Minifield smoked marijuana on the morning of February 28, 2016. Friesen Dep., ECF No. 256-1, at 14. Friesen testified that she never saw Minifield do cocaine. Id. at 21. Friesen testified that Josh Brown and others "were going to rob somebody for [cough syrup]." Id. at 4. Friesen got a call from Kelly Grafton yelling or screaming that "[t]hey robbed them anyways, there's a gun, . . . and everybody just scattered." Id. Friesen and Quay Pannell arrived by car at the parking lot for the Orchardcrest Apartments. Friesen testified that she

heard a Taser go off before she got out of the car. Id. at 11.  After she exited the car, Friesen

testified that she saw Minifield running through grass towards two fences. Id. at 9. Minifield

got over the first fence, id., and was headed in the direction of the corner where the wooden

fence met the metal fence. Id. at 10. Friesen described a blank spot where she lost sight of

Minifield as she ran around a house. Id. at 9. While behind the house and out of sight of

Minifield, Friesen heard a shot.

> Q. All right. And the shot—you heard the shot as you were—
>
> A. Right. There's like a blank spot. From the time we got out and ran around that house was the shot and we came running down that path. It doesn't look long at all until you actually go over there, but it's kind of a little—it's a long little path.

Id. at 14. After Friesen came around the house, she saw Minifield's body hanging on the fence,

with his head and arms dangling on one side of the fence and his feet on the other. Id. at 20.

Friesen saw officers rush in and grab Minifield off the fence. Id. at 12. Friesen did not see a

police officer shoot Minifield. Id. at 15. She recalled seeing a female officer with a Taser in her

hand. Id. at 16.

Minifield's sister, Tiana Johnson ("Johnson"), testified that in the days following her

brother's death, the family found a bullet in the yard near the chain link fence and turned it

over to the police. Johnson identified photos of the bullet and the location where it was found

for the jury.

Minifield's step-father, Wilfred Brown ("Brown"), testified that he visited the scene of

Minifield's death and saw drops of blood on the wood below the chain link fence. Brown

testified that he did not understand why the blood was present on wood along the chain link

fence when Minifield's body was some ten feet away. Brown also testified that he met with

the Virginia State Police investigators and was provided a summary of their investigation into Minifield's death.

Jacqueline Minifield Brown, Minifield's mother, testified that the Virginia State Police informed her that the police were chasing her son who jumped a fence, shot himself, and fell to the ground. Mrs. Brown testified that the version of the story told by the Virginia State Police changed over time in terms of the route her son was running and whether he jumped over the fence.  Brown was present when the bullet was found in the yard two days after Minifield's death.

Gerald Summers, the former police chief of McCall, Idaho, was called by the Estate as an expert witness as to law enforcement investigative techniques. Summers criticized the failure to conduct gunshot residue testing on Minifield. Summers noted the absence of blood spatter on the red wooden fence. Summers also noted the lack of blood in the photos of Minifield's upper torso following the failed CPR, but on cross-examination indicated that the medical examiner's photos showed blood on Minifield's coat.

After the Estate rested, defendant Sills called as a witness Frances Field, M.D., the forensic pathologist who performed the autopsy on Minifield for the medical examiner's office. Field testified that the cause of death was a gunshot wound to the head and the manner of death was suicide. Field testified in detail regarding the autopsy procedure and her observations during the autopsy. Field testified that the body had been kept overnight at a local funeral home and arrived in her office in Prince William County the next morning in a zip-tied body bag. Field indicated that it was quite common for bodies to be kept overnight in local funeral homes before being transported to the medical examiner's office. Field described

a perforating gunshot wound to the head entering the right side behind the ear and exiting from the left frontal bone, forehead area. Field testified as to the presence of soot around the entrance wound and in the subcutaneous tissue, indicating a contact wound. Field described a contact wound as one in which the muzzle of the gun was in contact with that area of the head. Field also testified to skull fracturing around the wound resulting from the release of gasses from a contact gunshot wound. Field described the entrance wound as a stellate wound typical of a contact gunshot wound. Field observed soot, but no stippling, confirming her view that this was a contact gunshot wound. Field explained that stippling occurs when a muzzle is further away from the skin—four to eighteen inches—and is caused by burnt, unburnt, and burning gunpowder particles.

Defendant Sills next called John DeFilippi, the case agent handling the investigation into the Minifield shooting for the Virginia State Police. DeFilippi testified as to the evidence obtained at the scene and the witnesses interviewed. DeFilippi testified that his investigation revealed that the revolver obtained from the scene was reported stolen in 2015. DeFilippi testified that he ordered DNA testing of the revolver and the police weapons issued to Sills and Ivins to see whether they bore any traces of Minifield's blood. DeFilippi testified that the blood on the barrel of the revolver correlated to Minifield's DNA, and that no blood was found on the two Glock service weapons. Ballistic testing determined that the bullet found in the yard had been fired from the revolver. DeFilippi issued a report concluding that the evidence was consistent with a self-inflicted gunshot wound. DeFillippi testified that the Department of Forensic Science does not do gunshot residue testing in the case of a suspected suicide. He added that the gunshot residue test has a binary yes or no result and does not

15

indicate quantity. Because the residue is transferred relatively easily, Minifield and any officers rolling him over, doing CPR, or handling the firearm would have residue on them.

Defendant Sills also called Richard Hankins, Virginia State Police Supervisory Special Agent, as a witness. On February 28, 2016, Hankins, worked as a violent crime investigator/evidence technician. Hankins described his investigation and evidence collection near the Grace Community Church in Winchester on that day. Hankins testified that DeFilippi assigned him with the task of collecting evidence and taking photos. Hankins took photos of the scene that evening and the next day. Hankins described the location of Minifield's body and the presence of Taser wires and probes. After receiving approval from the medical examiner's office, Hankins collected evidence from Minifield's pockets, including a plastic baggie containing a white substance and another containing green plant material. Hankins also photographed and gathered two cell phones, four yellow pills, a bloodied bag of green plant material, and a Charter Arms revolver that had been collected on the scene by Winchester police.  Hankins also collected four cartridge cases, one of which had been fired. The evidence recovered from the scene was stored at the Virginia State Police office in Culpeper.

## II.

Following the jury trial, the Estate filed a motion for new trial under Federal Rule of Civil Procedure 59 and a motion to set aside the verdict under Rule 60(b). Rule 59(a)(1)(A) provides that a court may grant a new trial on some or all of the issues:

> [A]fter a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." "In considering a motion for new trial, a trial judge may weigh the evidence and consider the credibility of witnesses, and if he finds the verdict is against the clear weight of the evidence, is based on false evidence or will result in a miscarriage of justice, he must set

> aside the verdict, even if supported by substantial evidence, and grant a new trial. The decision to grant or deny a motion for a new trial is within the sound discretion of the district court and will not be disturbed absent a clear showing of abuse of discretion.

King v. McMillan, 594 F.3d 301, 314–15 (4th Cir. 2010) (internal citations omitted).

> The court should grant a new trial only if 1) the verdict is against the clear weight of the evidence, 2) is based on evidence which is false, or 3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.

Dennis v. Columbia Colleton Med. Ctr., 290 F.3d 639, 650 (4th Cir. 2002).

Federal Rule of Civil Procedure 60(b) authorizes a court to grant relief from a final judgment, order, or proceeding on account of (1) mistake, inadvertence, surprise, or excusable neglect, (2) newly discovered evidence, (3) fraud, (4) a void judgment, (5) a satisfied judgment, or (6) any other reason that justifies relief. "A remedy under Rule 60(b) 'is extraordinary and is only to be invoked upon a showing of exceptional circumstances.'" Zahariev v. Hartford Life & Accident Ins. Co., No. 22-1209, 2023 WL 1519520, at *2 (4th Cir. Feb. 10, 2023) (quoting United States v. Welsh, 879 F.3d 530, 536 (4th Cir. 2018)). However, when a "post-judgment motion is filed within ten days of the entry of judgment and calls into question the correctness of that judgment it should be treated as a motion under Rule 59(e), however it may be formally styled." Dove v. CODESCO, 569 F.2d 807, 809 (4th Cir. 1978); see also MLC Auto., LLC v. Town of S. Pines, 532 F.3d 269, 277 (4th Cir. 2008) (evaluating a Rule 60(b) motion under the Rule 59(e) standard because it was filed within ten days of judgment). The instant motion seeking relief under Rule 60(b) was filed on September 26, 2022, ECF No. 309, just three days after the September 23, 2022, judgment, ECF No. 308.

Federal Rule of Civil Procedure 59(e),which provides courts with the power to alter or amend a judgment, "is an 'extraordinary remedy,' to be used 'sparingly,'" and is "available on only three grounds: 1) an intervening change in controlling law; 2) previously unavailable evidence; or 3) to correct a clear error of law or prevent manifest injustice." JTH Tax, Inc. v. Aime, 984 F.3d 284, 290 (4th Cir. 2021) (quoting Pac. Ins. v. Am. Nat'l Fire Ins. Co., 148 F.3d 396, 403 (4th Cir. 1998)). "Where a motion for reconsideration is based on purportedly newly discovered evidence, the evidence must not have been discoverable prior to judgment by the exercise of reasonable due diligence." Id. at 292 (citing Boryan v. United States, 884 F.2d 767, 771 (4th Cir. 1989)). To meet the manifest injustice standard, "a decision must 'strike [the court] as wrong with the force of a five-week-old, unrefrigerated dead fish.'" Squire v. Identity, Inc., No. 21-2410, 2022 WL 17038958, at *2 (4th Cir. Nov. 17, 2022) (quoting TFWS, Inc. v. Franchot, 572 F.3d 186, 194 (4th Cir. 2009)) (alteration in original).

The Estate asserts four grounds in support of the motion to set aside the verdict and for new trial. First, the Estate argues that the verdict was against the clear weight of the evidence. Second, the Estate claims that the length of the jury's deliberation suggests that it did not consider the evidence fairly. Third, the Estate asserts that the verdict is undermined by the lack of a proper chain of custody concerning the revolver involved in the shooting and Minifield's body. Fourth, the Estate contends that the court erred in admitting a toxicology report as to Minifield's blood. Each of these arguments will be addressed in turn.

## A.

The Estate first asserts that the jury verdict was against the clear weight of the evidence, essentially reframing for the court the arguments made to the jury during closing argument.

18

The Estate argued to the jury that this was a police shooting and that the police covered up their wrongdoing by planting a gun under Minifield's body. The Estate sought to support this theory by arguing that four officers testified that they did not see the gun when they rolled over Minifield's body. The Estate's argument now, as at trial, ignores the unrebutted testimony of Ivins, Harvey, and King that they saw a revolver under Minifield and that this revolver was secured by Brunson. Enke testified that she photographed the blood and dirt covered revolver that Brunson had secured and identified her photos of the revolver for the jury. Ivins, Harvey, and King identified the photographs taken by Enke as the revolver they saw under Minifield.

To be sure, Bradford, Medina, Shelton, and Enke testified that they did not witness a gun under Minifield, but each explained to the jury why that was the case. Bradford testified that her written report made no mention of a gun. On cross-examination, Bradford stated that she did not recall one way or the other whether there was a gun on the scene. On re-direct, Bradford testified that a subsequent traumatic brain injury has caused her to have some memory issues. Medina testified that his written report did not mention recovering a firearm at the scene because his report only recorded what he did and his role at this scene did not include collecting evidence. Rather, he was tasked with putting up crime scene tape to secure the area. By the time Enke arrived at the scene, CPR was underway. Enke photographed the revolver which Brunson had secured. Shelton was "way behind" Brunson as they ran to the scene and did not see what Brunson did before she got there. Shelton testified that it was protocol to secure firearms before undertaking CPR and that she was sure they secured the gun before she got to the scene. Finally, Sills testified that she was initially focused on getting the stuck cartridge out of her Taser and did not see a revolver at the scene. The jury had the

opportunity to evaluate this evidence regarding the location of the revolver and determined that it was not sufficient to prove that Minifield was shot and killed by a police officer.

The jury's verdict was amply supported by other evidence. Only one gunshot was heard, and forensic evidence linked the revolver found under Minifield to the bullet located in the adjacent yard. The revolver secured by Brunson and photographed by Enke had four cartridges in it, one of which had been fired. The photographs of the revolver admitted in evidence show that it was covered in blood and dirt, and forensic evidence was introduced that the blood on the revolver correlated to Minifield's DNA. Evidence was introduced that the revolver had been reported stolen. In contrast, no witness testified that a police officer shot Minifield or that a police-issued handgun was fired.

Dr. Field testified that Minifield's wound was a contact wound, meaning that the muzzle was in direct contact with Minifield's head. There was no evidence that any police officer was close enough to Minifield at the time of the gunshot to cause a contact wound. Sills and Ivins were the only officers present when they heard the gunshot, and each testified that they did not fire their handguns. Both Sills and Ivins were several yards away from Minifield and there was no evidence that either of them was close enough to inflict a contact wound.

The jury was tasked with sorting out two different accounts of where Minifield's body was located at the time of the gunshot. Sills and Ivins testified that Minifield was face down on the ground when he shot himself. In stark contrast, Green and Friesen testified that they could not see Minifield at the time of the gunshot because they were behind a house, but that after they cleared the house several seconds later, they saw Minifield hanging lifeless on a chain

link fence. Each testified that they saw officers rush up and pull Minifield off the fence and slam him to the ground.

The jury heard these irreconcilable accounts and concluded that the Estate did not prove that Minifield was shot and killed by a police officer. The jury's verdict was amply supported by the evidence, and there is no basis upon which the court can set the verdict aside and grant a new trial under Federal Rules of Civil Procedure 59(e) or 60(b).

**B.**

The Estate argues that the length of time the jury spent deliberating suggests that the jury "failed to answer the charge and failed to follow the Court's instructions." Mot. to Set Aside Verdict/For New Trial, ECF No. 309, at 9.  According to the Clerk's Minute Entry, the jury began its deliberations at 1:36 p.m., and returned with a verdict at 3:09 p.m. Minute Entry, ECF No. 302, at 1. The Estate argues that the jury could not have done its job by returning a verdict in 93 minutes.

"If the evidence is sufficient to support the verdict, the length of time the jury deliberates is immaterial." Guaranty Serv. Corp. v. Am. Emps.'s Ins. Co., 893 F.2d 725, 729 (5th Cir. 1990). In United States v. Burfoot, the defendant argued that the jury's short period of deliberation meant that it had not "fully deliberate[d]" or "follow[ed] the instructions" of the court to "consider all the evidence in the case." 899 F.3d 326, 343 (4th Cir. 2018). The court rejected this argument, because "juries are presumed to follow the judge's instructions, including the instruction to fully deliberate." Id. (citing Richardson v. Marsh, 481 U.S. 200, 206 (1987)). Here, just as in Burfoot, where the evidence is sufficient to support the verdict, the "length of a jury's deliberation doesn't refute that presumption." Id. (collecting cases).

## C.

The Estate argues that the court erred in admitting evidence concerning the forensic examination of the revolver found at the scene and Dr. Field's autopsy report because of chain of custody deficiencies concerning the revolver and Minifield's body. As to Minifield's body, the Estate argues that the autopsy report should not have been admitted because the body spent the evening of February 28, 2016, at a local funeral home before being transferred to the state medical examiner's office the next day. Field testified that the body had been kept overnight at a local funeral home and arrived in her office in Prince William County the next morning in a zip-tied body bag. Field indicated that bodies are frequently kept overnight in local funeral homes before being transported to the medical examiner's office because of time of day and staffing issues. There was no question that Field examined Minifield's body, and there was no evidence that the body had been tampered with before it arrived at the medical examiner's office. As to the revolver, witnesses testified that it was recovered on the scene by Brunson, photographed by Enke, and turned over to Virginia State Police crime investigator/evidence technician Hankins. Ivins, Harvey, and King identified photographs of the revolver as being the gun they saw under Minifield. Virginia State Police DeFilippi testified that DNA testing of the blood on the barrel of the revolver correlated to Minifield's DNA.

This evidence met the standard for authenticating the autopsy report, revolver and associated photographs that were shown to the jury. Federal Rule of Evidence 901(a) provides that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Rule 901(b) provides that this requirement may be satisfied through

testimony of a witness with knowledge that an item is what it is claimed to be. Field's testimony about her autopsy of Minifield's body, including introduction of her report and photographs, plainly meets the requirements of Rule 901. Field testified that the body arrived in the medical examiner's office in Prince William County the next morning from the funeral home in Winchester where it was stored overnight. While the Estate questioned Field about the propriety of keeping Minifield's body overnight in a Winchester funeral home, Field testified that this was a common procedure. There was no evidence that the body had been tampered with overnight. Field also testified that the body was received in a zip-tied body bag from the funeral home. As for the revolver, it was secured by Brunson, photographed by Enke, and collected by Hankins of the Virginia State Police. Enke identified photographs of the revolver she took at the scene, and Ivins, Harvey, and King testified that the photographs were of the revolver found under Minifield. This testimony was sufficient to authenticate the photographs of the revolver introduced in evidence.

The Estate's conjectural concerns about the chain of custody do not undermine the authentication and identification of evidence concerning Minifield's autopsy and the revolver. The 'chain of custody' rule is used to authenticate evidence before it is admitted in court, and to ensure that the item of evidence is what it purports to be. United States v. Howard-Arias, 679 F.2d 363, 366 (4th Cir. 1982). "[T]he ultimate question is whether the authentication testimony was sufficiently complete so as to convince the court that it is improbable that the original item has been exchanged with another or otherwise tampered with." Even if there is a link missing in the chain, the evidence may be admitted if there is adequate proof that the evidence was authentic and unadulterated. Id. The testimony of the state medical examiner

23

and the officers on the scene clearly met this requirement, and there is no basis to overturn the verdict simply because Minifield's body spent the night in a funeral home or because the revolver was secured and photographed by Winchester police personnel before being turned over to the Virginia State Police.

## D.

The Estate argues that the court erred in admitting into evidence the results of a toxicology report done as part of the autopsy reflecting controlled substances in Minifield's blood. At trial, Estate witnesses Green and Friesen testified that while Minifield smoked marijuana, he did not use cocaine. The fact that Minifield had cocaine in his blood at the time of his death was relevant as to credibility and to rebut the plaintiff's theory that Minifield did not use drugs other than marijuana and that the police planted the revolver and drugs on Minifield after they shot him. Further, as Minifield was on probation at the time, the presence of cocaine in his blood is consistent with the defense theory that Minifield, fearful of being returned to prison, chose to take his own life. See Order, ECF No. 175, at 2.

## III.

On September 27, 2022, the day after plaintiff filed her motion for a new trial, the court received a barely legible handwritten letter from Donald Bowman. In his letter, dated September 11, 2022, Bowman states that he is an inmate at the Regional Jail in Winchester, Virginia. As best as the court can decipher, the letter states as follows:

> My cellmate is Davon Irwin Brown. He [k]nows everything about what happen[ed] to D'Londre Minifield's Body was moved and how Shoot him. His other brother is in her[e] to[o] Joshua Brown. He told me everything that happen[ed] to Minifield on February 28, 2016 in Win[chester] Virginia. And he [k]nows to what happen[ed] that night five years ago.

24

> He said Officer Anna Marie Shelton a City police offier shot
> Minifield and [k]nows everything that happen[ed] that night in
> Winchester Feb. 28 2016. Shot him.
> Good Luck.
> He won't be here long.
> Officer Shelton [k]nows everything about the case and is holding
> back the truth to save her job as a police. She is no good at all.
> She should be fired from the City Winchester. But she won't
> because she is a female police officer an[d] no good also!!!

This letter was docketed the day it was received by the court, September 27, 2022. ECF No. 310.

In a pleading filed the next day, September 28, 2022, the Estate requested a hearing on the motion for a new trial. ECF No. 311. In support thereof, the Estate indicated that counsel spoke with Bowman by telephone at the Northern Regional Adult Detention Center on September 27, 2022. According to counsel, Bowman refused to answer questions and claimed not to know anything.  The motion also stated that Davon Brown was no longer incarcerated at the detention center and that counsel would update the court on information about Davon and Josh Brown.

The fact that Davon and Josh Brown may have information concerning the events of February 28, 2016, is not new information. The Case Summary of the Virginia State Police investigation into the death of Minifield mentions them both. See ECF No. 152-7, at 10–11. Davon Brown was interviewed by the Virginia State Police on the day of the shooting and did not indicate that he was present at the scene where Minifield died. Instead, he told the Virginia State Police that he ended up going back to his apartment and did not hear any gunshots. ECF 312-2, at 1. This account was corroborated by Green's testimony that when she returned to her apartment, Davon Brown was in a police car there. In any event, Davon Brown was

25

included on Plaintiff's Witness List for trial. See Plaintiff's Rule 26(a)(3) Disclosures, ECF No. 264, at 2.

Sills objects to holding a hearing on the motion for new trial, arguing that the verdict is amply supported by the evidence and that the Estate provides "no legitimate justification for failing to present evidence from Davon or Josh Brown at trial." Def.'s Opp'n, ECF 312, at 7. Defendant's opposition states as follows:

> Based on the evidence of record, Davon Brown was not at the scene. Davon Brown provided a statement to the Virginia State Police. (Exhibit 2). He never suggested he saw the shooting or was anywhere near the scene at the time the shot was fired. No witness places Davon Brown at the scene. Davon Brown was known by the Plaintiffs to have been involved in the events leading up to Minifield's death. Plaintiffs elected not to secure his declaration, deposition or trial testimony. Even if he had a factual foundation to offer any testimony regarding the shooter, Plaintiffs failed to exercise reasonable diligence. This case has been pending for more than 5 years. Rule 59(e) motions are not opportunities to raise the same arguments that could have been raised at trial or to "enable a party to complete presenting his case after the court has ruled against him." In re Reese, 91 F.3d 37, 39 (7th Cir. 1996). Plaintiffs could have secured Davon Brown's deposition testimony or Josh Brown's deposition testimony and elected not to (presumably because there is no indication from anyone that either saw the relevant events).

Id. at 7–8.

The court agrees that the Estate had years to obtain the testimony of Davon and Josh Brown but did not take their depositions or secure their attendance as trial witnesses. See Lawler v. Am. Bldg. Contractors, Inc., 149 F. App'x 131, 132–33 (4th Cir. 2005) (holding that, where a party had ample time to secure witness testimony prior to judgment, denial of that party's Rule 59(e) motion was proper). The trial has been held, and the Estate cannot now complain that the trial was unjust because the jury did not hear from them. Law enforcement

26

interviewed Davon and Josh Brown shortly after the shooting, and their identity as persons with knowledge of the events surrounding Minifield's death is a surprise to no one, including the Estate. Nor is there any evidence that either Davon or Josh Brown was present when Minifield died. No officers placed Davon or Josh Brown at the scene, nor did the Estate's witnesses Green or Friesen. Under these circumstances, the letter received by the court after trial does not provide grounds for a new trial, nor does the court believe that it provides sufficient reason to convene an evidentiary hearing.

## IV.

After years of protracted pretrial proceedings, this case was tried by a jury in September 2022, resulting in a finding by the jury that D'Londre Minifield was not shot and killed by a police officer. The jury considered the evidence and arguments of counsel, and the court cannot conclude that the verdict was against the clear weight of the evidence, was based on false evidence, or resulted in a miscarriage of justice. Nor has there been a change in intervening law, the discovery of previously unavailable evidence, or a manifest injustice. As such, the motion for new trial and to set aside the verdict, ECF No. 309, and the motion for evidentiary hearing, ECF No. 311, are **DENIED**.

It is so **ORDERED**.

Entered:  February 28, 2023

Michael F. Urbanski
Chief U.S. District Judge
2023.02.28 13:27:16
-05'00'

Michael F. Urbanski
Chief United States District Judge